HEALEY, In re. See Case No. 2,796.

HEALEY (BRADLEY v.). See Case No. 1,-781.

HEALEY (GRANT v.). See Case No. 5,696.

---

## Case No. 6,295.

### HEALEY v. MARTIN.

[Oliver's Forms (Ed. 1842) 483.]

District Court, D. Massachusetts. May, 1823.

SEAMEN — PROTECTION AGAINST OPPRESSION—AUTHORITY OF MASTER—DISOBEDIENCE OF CREW.

[1. A court of admiralty will always be solicitous to protect the rights of seamen, and redress any injuries and oppression to which they may be subjected; but, at the same time, it will exercise great care not to sustain any unreasonable demand on their part, which would have a tendency to loosen the ties of that wholesome discipline which should be maintained in every voyage, especially in long and arduous voyages, such as those to the northwest coast of America.]

[2. It is within the sound discretion of the master to judge as to when additional supplies of wood and water are necessary, and as to what risks should be incurred in procuring them; and the court will not be quick to infer that he recklessly, or without sufficient cause, exposed his men to attacks of savages.]

[3. The conduct of the master in imprisoning revolted seamen in the forecastle until they promised obedience, as well as his act in sending a boat crew for wood and water to an island where they were attacked by savages, sustained as within the limits of his just discretionary authority.]

[This was a libel by John Healey, a seaman, against William Martin, master of the ship Hamilton, for personal injuries while in the service of the ship.]

Samuel L. Knapp, for libellant.

Harrison G. Otis, Jr., for respondent.

DAVIS, District Judge. The libellant was a seaman on board the ship Hamilton, of which the respondent was commander, on a voyage from Boston to the northwest coast of America, to Canton, and back to Boston. The voyage commenced on the 7th of Sept., 1819, and terminated on the 9th of April last. More than two years of this long interval was spent on the northwest coast of America, and it was during that period that the transactions occurred of which the libellant complains. The libel alleges the sufferings of the complainant, with the rest of the crew, from bad and unwholesome food, and a confinement, by order of the respondent, commencing on the 30th of May, 1821, and continued for the space of seventy-two hours, without food, drink, air or light. It also alleges a wanton and cruel exposure to the savages, in an expedition in the boat for wood and water, of which, it is asserted, there was no want on board the ship at that time, and that the libellant was severely wounded in an attack made by the savages; the respondent, as it is alleged, well knowing their hostile disposition at that time and place.

The respondent, in his answer, admits the confinement, the employment of the libellant in the ship's boat, to procure wood and water, and the wound received by him in an attack by the savages; but asserts that the

confinement was a just and necessary measure to reduce a portion of the crew, among whom was the libellant, to obedience and return to duty, they having refused to do duty on board the ship; retiring to the forecastle, which the respondent caused to be closed, after repeated and ineffectual endeavors to prevail on them to return to the duties of their station, and that they were liberated as soon as they had relented and promised obedience. And, as to the injury received from the natives, he alleges that it was while the libellant was duly and necessarily engaged in the ship's service, in the proper duties of his station, and after every prudent precaution, without any fault or culpable act or omission on the part of the respondent.

It is often difficult to form a satisfactory judgment of the real state of facts, in regard to transactions at sea, which become matters of controversy. The evidence is frequently contradictory, and statements are exaggerated and inflamed. The difficulty is less, however, in the present case, than there would appear reason to apprehend from the nature of the dispute, the degree of combination which existed, and the collision between authority and disobedience. The essential features of the transaction in question are sufficiently prominent, and leave little room for doubt or delay, in regard to the judgment which ought to be pronounced on the subject.

The confinement of the party of men, thirteen in number, of which the libellant was one, was indeed long and severe; but the master was placed in a difficult and distressing dilemma, by the sudden and determined revolt of such a large portion of his crew. They were in a state of mutiny, and unless they could be, by some means, reduced to obedience, the consequences must have been disastrous. The voyage would have been ruined, and the lives of all on board were, on that savage coast, in imminent danger. There may have been some ground of complaint in respect to their food, for a short time before the adoption of the culpable measure to which these men resorted. Admitting, however, that the salted halibut, with which they were dissatisfied, was not according to the fair expectation which they might entertain, under their contract, it was not so intolerable as these men were disposed to represent it. The officers shared this unwholesome diet with the crew; the use of it had not been of long continuance; the new station, to which they were proceeding, might furnish fresh supplies of fish and game, and, with the plentiful supply of bread, the addition of pork, and occasional messes of rice, beans, and flour, to say nothing of the coffee or tea every morning and evening, and the weekly allowance of spirits, it is difficult to believe that there could be any apprehension of starvation, or that it was necessary to organize a revolt, to compel a change of provisions, or an additional allowance. A querulous humor, incident probably to long and monotonous voyage, was unduly indulged by the crew. With much greater privation than appears to have existed on board the Hamilton, there should have been more patience and forbearance than was manifested by the discontented party of this crew; and when the whole history of this very long voyage is examined, there appears no reason to believe that real grievances would not have been, in due time remedied, if it were practicable, without a resort to such a desperate expedient as was adopted by those misguided men. There was, evidently, a fixed and resolute determination to compel the master of this ship to terms, by an obstinate refusal of duty. Without the discharge of that duty the ship was evidently endangered, and no calculation could be made of the extent and issue of that dangerous proceeding, if the revolters could not be persuaded or compelled to submit. Conduct so extraordinary demanded, and, in my opinion, fully justified the extraordinary measures adopted by the commander. Conciliatory offers were repeatedly made to them, and as repeatedly slighted or refused. They were confined in the place to which they had voluntarily repaired, when their duty and the call of their officers required them to be upon deck; and it was their own fault and folly that they were not sooner relieved. Severe and painful as this operation undoubtedly was, it is exaggerated in the libellant's statement. These men were not without food, for they had a sufficient supply of bread, and some of the tampions were occasionally removed from the apertures in the deck, for the admission of air. Captain Martin, while in the exercise of the harsh measure of coercion, to which he was impelled by the occasion, had a considerate regard to the dictates of humanity. Recollecting that two of the men in the forecastle were sick, he immediately sent for them, and (to use the language of the log-book) begged them to come and live in the cabin, offering to give them every thing they should want, if it were in the ship. This kind offer was refused, and this incident, as well as the determination of the man at the helm to leave his station, to unite himself with the men in the forecastle, and to be confined with them, affords striking evidence of the strength and extent of the alarming combination which existed.

In regard to the skirmish with the Indians, June 3d, 1821, the complaint, in my opinion, is equally groundless. The suggestion of a wanton indifference in Captain Martin to the safety of his crew, and of a willingness to subject them to slaughter by savages, is not supported by the evidence. If he were destitute of the common feelings of humanity, a regard to self-preservation alone, would have forbidden the exercise of such unnatural dispositions. Strong and intem-

perate expressions, under excitement from misbehavior, undoubtedly escaped him; but the general care of his men appears to have been humane and proper; and the successful termination of such a long and laborious voyage, under peculiar difficulties, affords no inconsiderable indication of his prudence and discretion, as well as of his firmness, resolution, and self-command. It is said that he was warned by Captain Harris of the hostile temper of the natives, and cautioned against going or sending on shore; that he had provoked resentment, by retaining a quantity of oil, said to belong to some of the natives, and that there was no necessity for wood or water, for which the boat was despatched. The trade in which this ship was engaged, is always more or less hazardous, and those who embark in such voyages may be presumed to make up their minds to encounter the difficulties and dangers incident to the employment. With every disposition to indulgence, on the part of the officers, there must be instances of inevitable exposure, and he who has the responsible office of managing the whole concern, must be the best judge in what manner to direct its operations. In the exercise of this command, under the various emergencies which occur, his conduct should be candidly estimated, and cruelty or caprice should not be imputed to him without the fullest evidence. Captain Martin was, indeed, informed that the Indians were in a hostile mood. Still it was competent for him to determine as to the measures he should adopt. In regard to the supposed cause of that irritation, it would be unreasonable to impute blame to Captain Martin, when the well-known traits of savage character are considered. The fact of their irritation was indeed important, and required precaution. Such precaution appears to have been exercised. Wood and water, in the opinion of the master, were required, and the boat was sent to procure them. The boat was well manned, and well armed, and a cautious course was prescribed in approaches to the shore. The officer was directed to look carefully round the island, from which wood and water were to be procured, and a landing was not to be made, if any Indians were seen. Capt. Martin, as was justly observed by his counsel, could not have done more to ensure the safety of his men, if they had been his children. As the boat was about to land, Indians were descried by Capt. Martin, before they were seen by his men in the boat. He immediately gave the alarm, and ordered the boat to return to the ship. In the return she was attacked by the natives in two canoes. The daring assault was bravely repelled; the libellant and one of his companions being unfortunately severely wounded in the conflict.

The view taken by some of the men of Capt. Martin's preparation to discharge a cannon from the ship during the contest, appears to me extravagant and groundless. It is said it was criminally or most carelessly pointed, and that, if it had been discharged at the moment intended and in the direction given, it must have destroyed some of his own people. It would require much more evidence of all the circumstances of the affair than has been furnished, to bring my mind to an adoption of the uncharitable opinion which these men seem to have entertained on this subject. In the hurry and anxiety of such a critical moment, a mistake might have been made; and if the cannon had been discharged, and the result had been calamitous, still the conduct of the master should have received a candid and benignant construction. But it was not discharged in the direction indicated, and the speculations that have been offered as to the probable event if it had been fired in that direction, are too uncertain, and the supposition suggested too palpably gratuitous, to be sustained in the deliberate estimate which the court is required to make on the subject. The language used by Captain Martin on the occasion, should receive a liberal interpretation. The remark was in reply to suggestions probably irritating and offensive. The general treatment of his men does not warrant the construction which has been urged. We are to make allowances for the habits of the profession, and for modes of speech, in which less is often meant than meets the ear.

It would be unjust to infer a malignant intent from a strong but hasty expression, uttered in a moment of excitement. Upon a deliberate view of the evidence, I consider this expedition in the boat as a fair application of the discretionary powers of the commander of the ship, and as incident to the nature of the employment. Its results furnish no just ground of complaint against the master of the ship, much less a demand for damages. The men behaved bravely, and those who had the misfortune to be wounded, are entitled to compassionate and generous attention from the owners of the ship. Such attention, I can have no doubt they will receive, if benevolent offices should not be repressed by improper deportment on the part of the men.

The counsel for the libellant has justly and eloquently eulogized the hardihood of our seamen, by which maritime enterprises of uncommon character are successfully accomplished. The energetic spirit by which our maritime adventures are extended, well merits the commendation. It should be remembered, however, that the crews of our ships are not the only agents in these arduous services. The officers partake most deeply of the labors and perils which belong to the employment; and from the high responsibility which they sustain, their minds are constantly exercised by anxieties and cares, from which the crew are, in a

great degree, exempted. In this voyage we have an example of what enterprise and perseverance may accomplish; and it is but one of many instances of like kind, furnished by the history of our commerce. These interesting pursuits have their systematical arrangements, essential to their success, which it would be rash, and probably ruinous to the trade, to violate or to interrupt.

The best concerted plans for the prosecution of these remote and circuitous expeditions will be defeated if strict discipline be not preserved. The cod fishery has its peculiar character, and may be conducted, as it habitually is conducted, with all the familiarity and simplicity of domestic economy or of rural occupations. The various operations at sea and on the fishing-ground, are subjects of mutual consultation, and the shipper is little more than primus inter pares. It is far otherwise on voyages to the northwest coast, in which our countrymen so early engaged, and which they have so perfectly reduced to system. They require, in a great degree, the subordination, strict obedience, and deference to command, which are practised in military regimen. In this connection, I cannot but notice a circumstance, incidentally mentioned in the log-book of the Hamilton. On the 28 May, two days only before the secession of the crew, one hundred and thirty canoes were numbered alongside the ship at one time. Without the utmost vigilance, strict subordination, and perfect command of the whole strength of the ship, assaults from the savages and fatal destruction must be expected to ensue. The important interests at stake, demand the solicitous attention of courts deciding on such controversies, not to weaken the great moral tie, without which all the machinery of navigation would be useless. It is painful to perceive any symptoms of departure from habits of obedience and respect to authority, by which navigation and commerce have been so greatly advanced. Even in our whaling ships, where such irregularities would not be apprehended, we find recently instances of insubordination and revolt, of an alarming character.

In maritime controversies coming under the cognizance of the court, it has never, I trust, been indifferent to the wrongs and injuries which seamen may have sustained. In the present case, I have been disposed to hear every thing that could be disclosed, and the inquiry has been extended beyond the usual limits of such investigations. This course was considered to be due to the nature of the complaint, the remote distance to which the men were removed from their country and friends, and the great length of time for which they were engaged. I cannot, as appears to me. sustain the libellant's demand, without implying a surrender of the wholesome discipline which

should be maintained in every voyage, and which, in voyages of this description, is peculiarly important. With these views of the subject, I must dismiss the libel, with costs.